UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREEPLAY MUSIC, LLC,

    Plaintiff,

v.

AWESOMENESS LLC and BIG FRAME, INC.,

    Defendants.

Civil Action No. 15 CV 1119

JUDGE DANIELS

**COMPLAINT AND JURY DEMAND**

Plaintiff Freeplay Music, LLC ("FPM"), through its undersigned attorneys, Baker Hostetler, LLP, complains of defendants Awesomeness LLC ("Awesomeness") and Big Frame, Inc. ("Big Frame," and with Awesomeness, the "Defendants"):

### Nature of the Action

1.     YouTube has become the premier source for digital entertainment. Every minute, 3 million videos are viewed on, and 300 hours of new content is uploaded to, YouTube. Sometimes referred to as the TV of the internet, its millions of videos garner billions in revenue. With the growth of YouTube's audience, a new breed of companies—dubbed multichannel networks (MCNs)—arose to capitalize on YouTube's vast revenue stream. In their effort to become the TV networks of YouTube, the MCNs create and acquire video content, which they monetize. Like traditional TV networks, MCNs are responsible for securing rights to content and ensuring they do not infringe the intellectual property rights of others. But in many cases, like this one, that responsibility has been eschewed to the detriment of copyright owners, like FPM. The MCNs have misappropriated FPM's copyrights and profited from that misappropriation, in clear violation of copyright law.

2. With a library boasting tens of thousands of musical works—generating more than 1.8 million licenses in the last 20 months alone—FPM has, since its inception in 2001, always embraced technology and successfully remained at the leading edge of the paradigm shifts in the music industry. To help monitor unknown uses of songs in its catalogue, FPM teamed up with a related but independent company called TuneSat, which has the premier audio recognition technology.

3. While seeking to uncover unknown uses of its clients' music, TuneSat discovered various MCNs exploiting FPM's copyrighted music. None of these uses were authorized. Although there appears to be unauthorized uses of other copyright holders' music, the size and success of FPM's catalogue, coupled with its alliance with TuneSat, is the reason FPM was first to recognize and address what appears to be a systemic problem.

4. With TuneSat's technology and evidence of clear copyright infringement, FPM approached various MCNs to alert them to this issue. Rather than simply suing, as it could have, FPM continued to explore solutions to this problem. But despite their recognition that FPM's copyrights were being infringed, the MCNs ceased serious negotiations. Last week, two brought declaratory judgment actions, and other MCNs—including Defendants—have refused to address their infringement and/or properly compensate FPM.

5. Defendants exploited at least fourteen of FPM's copyrighted musical works. That exploitation comes at the expense of FPM, who never authorized Defendants' use. Given the industry's apparent decision to ignore this infringement, FPM is now left with no alternative but to bring this action, and others like it, to protect its rights and the rights of hundreds of composers it represents.

## Parties

6. FPM is a Delaware limited liability company, with a principle place of business in New York, New York.

7. Upon information and belief, Awesomeness is a California limited liability company, with a principal place of business at 11821 Mississippi Ave., Los Angeles, California 90025.

8. Upon information and belief, Big Frame is a Delaware corporation, with a principal place of business at 8965 Lindblade Street, Culver City, California 90232.

9. Upon information and belief, Awesomeness purchased Big Frame within the last year.

## Jurisdiction and Venue

10. FPM's claims arise under the Copyright Act, 17 U.S.C. §§ 101 *et seq*. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1338.

11. Venue in this District is proper under 28 U.S.C. § 1391.

12. The Court has personal jurisdiction over the Defendants because they conduct systematic and continuous business over the internet, knowingly and repeatedly transmitting video files over the internet to New York residents, and have performed acts, causing harm to FPM, including infringing copyrights belonging to FPM, a New York copyright holder, which give rise to this action.

## Creation of FPM and Its Business

13. FPM's founder and CEO, Scott P. Schreer, is one of America's most prolific and performed TV composers and producers. As the driving creative force behind many of today's top music branding and music packages for sports broadcasts, Schreer's credits include the *NFL*

on Fox theme, the *MLB on Fox* theme, the opening theme and underscore for ABC's *Hope and Faith*, and *The Cosby Show*, among many others. One of New York's top studio musicians and producers, Schreer has earned several Emmy nominations, seven BMI Writer of the Year awards (2007-2013), and has written thousands of music compositions over the course of his career. Schreer was recently voted one of America's Top 40 Music and Sports people of 2014 by ESPN Magazine.

**FPM**

14. In 2001, Schreer launched FPM, a high quality online music library. The music industry was changing and facing new challenges, so FPM sought to create an environment in which both emerging and established composers and artists had the opportunity to expose their music to television and film licensing while maintaining the ability to exploit that music in other mediums. Schreer, himself, is a contributing composer to a portion of FPM's catalogue.

15. At inception, FPM's business model was focused primarily on licensing music for television and feature films. The use of a musical work in any audio-visual form—such as part of a motion picture, television program, commercial, music video or other video, including a video streamed over the Internet—requires authorization from the owner of the copyrights to the musical composition and the sound recording. This authorization is referred to as a "synchronization license."

16. Music used in television and film generates revenue through: (i) public performances; and (ii) upfront fees for synchronization licenses (for synchronizing music to video). Music and videos are "performed" when they are broadcast or otherwise transmitted to the public, such as on television, cable, satellite, internet, radio, etc. Performance Rights Organizations ("PROs"),

such as BMI and ASCAP, collect the fees for public performances and pay royalties to the rights holders for broadcasts and other transmissions of this music.

17. Focusing on the public performance income stream, FPM granted free synchronization licenses to qualified network broadcasters. FPM's business model was visionary, in that it eliminated synchronization fees, a barrier to entry. This new business model provided FPM's music a competitive edge in the marketplace: producers were incentivized to use FPM's music as their initial budget was reduced. But by increasing its market share, FPM would generate additional performance fees, especially when a television program was successful.

18. Offering a free synchronization license for non-commercial uses was a key component of FPM's model. The more its music was used, the more appeal it would have for a wider audience. Because its catalogue was meant to be used in audiovisual works, FPM was only concerned with profiting from business and/or commercial uses of its music.

19. To help develop its business model and increase exposure to its music, from about 2001 to 2005, FPM entered into a non-exclusive license with Apple. Under that arrangement, Apple customers worldwide could freely download certain of FPM's copyrighted music for their personal use. FPM's copyright music was also made available through Apple's DVD Studio Pro and Final Cut Pro video editing software, which allowed customers to add a soundtrack to their personal videos. FPM offered Apple customers free synchronization licenses for "personal, non-commercial uses"; if a customer's intended use of FPM's music was commercial and/or for-profit, the customer was required to obtain a separate synchronization license from FPM.

20. FPM's business has grown significantly since 2001. FPM now acts as a music publisher for hundreds of composers and almost 50,000 musical works, 15,000 of which are currently available on its website. This, however, is only a tiny fraction of the submissions FPM receives.

605907805.1

Because FPM will only represent commercially viable music, it rejects approximately 90%-95% of all submissions.

### *FPM's Website*

21. Since 2001, FPM also has made its catalogue available on its website. Customers always could download music from the FPM website. And consistent with its business model, FPM issued free synchronization licenses for certain uses, including: (i) national television broadcasts; (ii) feature-length films in U.S. theaters; (iii) in-class education; and (iv) personal use. The first two types of uses were, again, to lower the barrier to entry for film and television. The third and fourth were for exposure.

22. There was never any ambiguity about what constituted a "personal use." The terms of use published on FPM's website (the "Prior Terms of Use") made clear that personal use included only "non-commercial purposes," such as "personal listening pleasure" and "family slide show[s]." Excluded from personal use was any exploitation of FPM's music "posted on a website."

23. Under FPM's Prior Terms of Use, all other uses, including on both personal and revenue generating websites, required a license. For videos, a synchronization license was required. To request a license, a customer was required to complete a form, which included the customer's explanation of the intended use of FPM's music.

24. Under FPM's Prior Terms of Use, a customer could not exploit FPM's copyrighted music on YouTube without a synchronization license.

25. The personal video market evolved and more users turned to YouTube for displaying, listening, and viewing content. Likewise, more users were using YouTube as the sole medium

for personal videos. Recognizing this trend, in 2013, FPM expanded the scope of the free synchronization licenses it offered. FPM's synchronization licenses began allowing customers to exploit certain music in personal videos on YouTube.

26.  In August 2013, FPM rolled out its new website, and began offering approximately 2,000 titles free for non-commercial use on YouTube.

27.  When a user logs on to FPM's website, http://www.freeplaymusic.com/, the user is presented with a variety of choices and thousands of musical works (i.e., sound recordings and the underlying musical compositions), all of which are available for certain types of exploitation. Once the user chooses the desired musical work and selects "Add to Cart," the user is prompted to choose a license type:



28.  The user cannot "Proceed to Checkout" without choosing a license type. A synchronization license to play the track in a YouTube video has two options: (i) "Business Use," which costs $250 for a one-year license, and (ii) "Personal Use," which is free.

605907805.1

29. Under the terms of the synchronization license for "Personal Use," which is free, FPM has the right to make a claim and receive revenue from YouTube for exploitation of those videos. This is made clear when the user chooses "Personal Use," with the following terms:

> Please read our TERMS OF USE carefully about the restrictions of this license. Freeplay reserves the right to "claim" this music with Google and monetize its use on your video. If you would like the ability to monetize your videos or don't want us to monetize your video you need to purchase a license. If you are a Multi-Channel Network managed channel, such uses are considered Business YouTube Uses and a license must be purchased. Please contact our licensing department for a quote: contact@freeplaymusic.com or (212) 974 0548.

30. Once the user chooses a license and decides to "Proceed to Checkout," a window pops up displaying the "FPM License," requiring the user to enter an email address confirming that he or she has read the terms of the license. A copy of the license is then e-mailed to the confirmation address entered by the user. The FPM personal synchronization license grants the user the right to use the musical work for the "sole, limited and restricted purpose" of "Personal use on YouTube only."

31. Since August 2013, FPM has issued over 1.8 million licenses to the copyrighted music in its library.

**TuneSat**

32. After over a decade of research and development, in 2009, Schreer and Chris Woods launched TuneSat, a global online audio fingerprint technology and recognition service. TuneSat was established to help monitor broadcasts and other transmissions (i.e. public performances) of music. TuneSat enables music copyright holders to digitally detect where their work is being exploited by searching across various platforms for matches. Tunesat tracks 320 television

605907805.1

networks in 14 countries, including the United States, United Kingdom, Germany, France, Spain and Italy, and has over 50 million fingerprinted songs in its database.

33. TuneSat provided the perfect solution to copyright owners, like FPM, whose main source of income was based on payment for broadcasts and other transmissions of the films and television shows.

34. In 2012, TuneSat launched a product to detect unknown streaming of music across the Internet. TuneSat's web monitoring product searches publicly available domains, identifying music used in streaming audio, video, podcasts, and other multimedia files, including content on YouTube.

35. Although TuneSat has many other clients, TuneSat's technology was the perfect analog to FPM—it could detect the public performance of FPM's copyrighted music across the Internet. TuneSat detected the rampant use of FPM's copyrighted music by the MCNs, including the uses by the Defendants here.

### Defendants and the MCN Business

36. Most content on YouTube is uploaded by individuals, but media corporations and other organizations, including MCNs, use YouTube as a platform to distribute content.

37. Defendants are MCNs.

38. MCNs are independent companies that are built on top of the YouTube platform, using YouTube's video capabilities and monetization platform. Although there are many MCN channels on YouTube, consumers cannot necessarily detect whether they are watching a video on YouTube's network or on an MCN's.

605907805.1

39. MCNs create and stream their own content. They also scour YouTube, inviting channels that gain popularity to join their networks. MCNs offer programming, funding, digital rights management, monetization/sales, and audience development services. In return, the MCNs keep a percentage of the advertising revenue from the channel and drive-up their viewership through the channels popularity, further increasing their advertising revenue. MCNs will also offer to exploit this content in other places, including on their own websites.

40. MCNs are a multi-billion dollar business. In 2013, Awesomeness was acquired for approximately $117 million. By December 2014, Awesomeness was valued at $325 million.

41. But MCNs' lucrative business model also has created significant concerns, including increasing opportunities for copyright infringement. Upon information and belief, in response to those concerns, in 2014, YouTube issued a policy requiring MCNs to designate each channel within its network as an "affiliate" or "managed" partner.

42. Channels designated as affiliates take full responsibility for their content, which is reviewed and approved by YouTube. Those channels are not at issue here.

43. For channels designated as managed partners, the MCN is responsible for copyright compliance and instituting safeguards to protect against copyright violations. In exchange for their agreement to self-police, MCNs are permitted to monetize videos instantly and to the exclusion of third parties.

44. Because YouTube does not review MCN managed channels' content, copyright owners are not advised by YouTube of the use of their content. This means that when a managed channel uploads a video that includes FPM's copyrighted music, FPM is not notified by

605907805.1

YouTube. Content owners, like FPM, only learn of the use of their content if the MCN advises them or through happenstance.

*Utilizing TuneSat's Technology, FPM Learns of MCNs' Unauthorized Use*

45. With over 200,000,000 impressions to its website as of 2013, FPM is one of the most widely trafficked production music libraries in the industry.

46. But before TuneSat, FPM suffered from the same problem as other artists, publishers, and copyright owners—the inability to track the unlicensed uses of its copyrights.

47. By hiring TuneSat, FPM uncovered and exposed the systemic unauthorized use of its copyrighted music by MCN managed channels, such as Defendants' managed channels.

48. For over a year, FPM and its administrator have been notifying MCNs that FPM's copyrights have been infringed and exploited without authorization. FPM and Tunesat approached the MCNs—including Defendants—offering a variety of solutions. None were deemed acceptable.

49. To date, most MCNs, including Defendants, have refused to remedy this wrongdoing.

50. FPM negotiated with many MCNs, including Defendants. Last summer, FPM and TuneSat showed Awesomeness how it could utilize TuneSat's technology to monitor and protect against potential infringement. But just as they refused to take a proper synchronization license from FPM before uploading the videos, or otherwise police against this infringement, Defendants, like other MCNs have decided to ignore this infringement.

11

605907805.1

**The FPM Copyrights at Issue and Defendants' Unauthorized Exploitation**

*FPM's Copyrights*

51. FPM is the owner of the registered copyrights (the "FPM Copyrights") in and to the musical compositions and sound recordings (the "FPM Copyrighted Music") set forth below:

   a. "City Light," covered by Registration No. SR 337-201 covering the collection *Acid Jazz Volume 1*.

   b. "Walkin the Dog," covered by Registration No. SR 337-201 covering the collection *Acid Jazz Volume 1*.

   c. "Fight the Monsters," covered by Registration No. SR 633-491 covering the collection *Freeplay Music CD #13*.

   d. "*Maximus Rules*," covered by Registration No. SR 382-040 covering the collection *Freeplay Music Corp. DVD #1*.

   e. "Sexy Beat," covered by Registration No. SR 382-040 covering the collection *Freeplay Music Corp. DVD #1*.

   f. "A Walk in the Sun," covered by Registration No. SR 382-040 covering the collection *Freeplay Music Corp. DVD #1*.

   g. "Funky Summer," covered by Registration No. SR 335-614 covering the collection *Hip Hop Volume 2*.

   h. "Sit Tight," covered by Registration No. SR 374-911 covering the collection *Freeplay Music Corp. DVD #4*.

   i. "My Wild Child," covered by Registration No. SR 337-216 covering the collection *Hip Hop Volume 1*.

   j. "Attitude Booty," covered by Registration No. SR 374-911 covering the collection *Freeplay Music Corp. DVD #4*.

   k. "Piano Stripped," covered by Registration No. SR 396-282 covering the collection *Freeplay Music Corp. DVD #9*.

   l. "Etude Blanc," covered by Registration No. SR 337-059 covering the collection *Solo Instruments Volume 1*.

   m. "Mach 77," covered by Registration No. SR 337-221 covering the collection *Sports Highlights Volume 3*.

6059907805.1

n.  "Raggae Christmas" covered by Registration No. SR 633-487 covering the collection *Freeplay Music CD #14*.

*Defendants' Unlicensed Use of the Music Copyrights*

52. From October 9, 2010, Defendants have engaged in at least 22 uses of the FPM Copyrights, including:

a. FPM's copyrighted musical work "City Lights" is exploited on the following websites: http://www.youtube.com/watch?v=AUh8KDTTsR8; http://www.youtube.com/watch?v=b8oO0RsxvuE; and http://www.youtube.com/watch?v=8fiC4h2fGLk;

b. FPM's copyrighted musical work "Walkin the Dog" is exploited on the following website: http://www.youtube.com/watch?v=uIKN_1iTKBA;

c. FPM's copyrighted musical work "Fight the Monsters" is exploited on the following website: http://www.youtube.com/watch?v=0XYcjzZeEHA;

d. FPM's copyrighted musical work "Maximus Rules" is exploited on the following websites: http://www.youtube.com/watch?v=GAxS_Lh4rjE; and http://www.youtube.com/watch?v=N_qpqHxtENw;

e. FPM's copyrighted musical work "Sexy Beat" is exploited on the following website: http://www.youtube.com/watch?v=DG7FWO-STTE;

f. FPM's copyrighted musical work "A Walk in the Sun" is exploited on the following website: http://www.youtube.com/watch?v=q60hYGnnp28;

g. FPM's copyrighted musical work "Funky Summer" is exploited on the following websites: http://www.youtube.com/watch?v=BFX9UQw-buo; and http://www.youtube.com/watch?v=wb_nNcO2Jv4;

h. FPM's copyrighted musical work "Sit Tight," is exploited on the following websites: http://www.youtube.com/watch?v=jcNpTKZPXeU; and http://www.youtube.com/watch?v=fo9pWpsglVc;

i. FPM's copyrighted musical work "My Wild Child" is exploited on the following websites: http://www.youtube.com/watch?v=4_GgY0Vj8hY; http://www.youtube.com/watch?v=N_qpqHxtENw; and http://www.youtube.com/watch?v=2aT1otg0IT0;

j. FPM's copyrighted musical work "Attitude Booty" is exploited on the following website: http://www.youtube.com/watch?v=knxHVCtmAYM;

k. FPM's copyrighted musical work "Piano Stripped" is exploited on the following website: http://www.youtube.com/watch?v=b8oO0RsxvuE;

13

l. FPM's copyrighted musical work "Etude Blanc" is exploited on the following websites: http://www.youtube.com/watch?v=mnCHUq99ork; and http://www.youtube.com/watch?v=Jq8IOD3OldI;

o. FPM's copyrighted musical work "Mach 77" is exploited on the following website: http://www.youtube.com/watch?v=0XYcjzZeEHA; and

m. FPM's copyrighted musical work "Raggae Christmas" is exploited on the following website: http://www.youtube.com/watch?v=MlnMqsn4H8g.

53. Upon information and belief, Awesomeness itself downloaded "Etude Blanc."

54. Upon information and belief, Defendants monetized the uses of FPM's Copyrighted Music by, among other things, placing advertisements in those videos and/or using the viewership of those videos to increase the amount of their advertising revenues.

### Count I:
### Copyright Infringement

55. FPM incorporates the allegations set forth in paragraphs 1 through 54 hereof, inclusive, as though the same were set forth herein.

56. This cause of action arises under 17 U.S.C. § 501.

57. Each of the FPM Copyrights has been registered with the United States Copyright Office.

58. FPM owns all exclusive rights under 17 U.S.C. § 106 to the FPM Copyrighted Music.

59. Each of the musical works covered by the FPM Copyrights is an original work and constitutes copyrightable subject matter within the meaning of 17 U.S.C. § 102.

60. FPM has never granted Defendants or otherwise authorized Defendants to exploit the musical works covered by the FPM Copyrights.

61. Defendants' acts violate FPM's exclusive rights under 17 U.S.C. §106.

62. Defendants' infringement of the FPM Copyrights is and has been willful, intentional, purposeful, and/or in disregard of FPM's rights.

63. FPM is entitled to its damages and Defendants' profits from the alleged infringement, in an amount to be proven at trial.

64. In the alternative, FPM is entitled to statutory damages, in an amount of up to $150,000 per infringed copyright.

## PRAYER FOR RELIEF

WHEREFORE, FPM respectfully prays for judgment against Defendants as follows:

(a) for a ruling that Defendants have willfully infringed FPM's copyrights;

(b) for injunctive relief prohibiting Defendants from exploiting the FPM's copyrighted music;

(c) for FPM's damages and, to the extent not duplicative, Defendants' profits attributable to the infringement;

(d) in the alternative to actual damages, for statutory damages under 17 U.S.C. § 504(c), in an amount of up to $150,000 per work;

(e) for FPM's costs of this action, including reasonable attorneys' fees under 17 U.S.C. § 505;

(f) for prejudgment and post judgment interest; and

(g) for such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

FPM requests a trial by jury on all issues so triable.

Respectfully submitted,

BAKER HOSTETLER, LLP

Dated: February 17, 2014
New York, New York

By: _____
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Tatiana Markel
Email: tmarkel@bakerlaw.com
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4624
Facsimile: (212) 589-4201

*Attorneys for Plaintiff*

605907805.1